UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

LEIBYS MERCEDES,
a/k/a "Celly,"

Defendants.

17 Cr. 419 (KMK)

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT LEIBYS MERCEDES'S
MOTION FOR A *FRANKS* HEARING**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Samuel L. Raymond
Daniel Loss
Michael D. Maimin
Assistant United States Attorneys
 *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

I.      Preliminary Statement ............................................................................... 1

II.     Background ................................................................................................. 1

III.    Argument .................................................................................................... 6

      A.      Mercedes has not met his heavy burden to obtain a *Franks* hearing; indeed, he has not even pointed to a misrepresentation ...................................... 6

          1.      Applicable Law ................................................................................ 6

          2.      Discussion ........................................................................................ 9

               a.      "CS-1 made a controlled buy of heroin stamped with a red insect, from Acquino on January 1, 2017." .................................. 10

               b.      "Law enforcement believes that Coleman is purchasing Heroin from Acquino," and "CS-1 has informed law enforcement that CS-1 was present when Coleman bought Heroin from Acquino." ................................................................. 11

      B.      The Government has not engaged in misconduct ................................. 14

          1.      Mercedes's claims of misconduct are speculative and baseless .............. 14

          2.      Mercedes has suffered no prejudice from Officer Fogarty's imprecise testimony before the June 29, 2017, grand jury about his identification of Mercedes's phone number ............................................. 20

IV.     Conclusion ................................................................................................ 22

## I.       Preliminary Statement

The Government respectfully submits this opposition to the motion filed by defendant Leibys Mercedes, a/k/a "Celly," for disclosure of grand jury testimony and for a *Franks* hearing (the "*Franks* Motion"). (Docket Entry 136).[1] On October 22, 2018, the Government provided Mercedes with the requested grand jury testimony; accordingly the *Franks* Motion is moot to the extent that it seeks such testimony. However, there is no basis for a *Franks* hearing, and Mercedes has not even attempted to meet the high burdens to merit such a hearing. Moreover, Mercedes previously moved to dismiss the indictment (Docket Entry 127) (the "Motion to Strike"),[2] and supplements that argument in the *Franks* Motion. However, Mercedes adds nothing but conclusory assertions of rampant government misconduct, which are wrong.

This Court can and should readily reject Mercedes's requests for both a *Franks* hearing and to dismiss the S2 Indictment.

## II.      Background

On June 29, 2017, a grand jury in this District returned indictment 17 Cr. 419 (KMK), which charged that, from at least in or about February 2017 up to and including in or about June 2017, Mercedes, Christopher Coleman, a/k/a "Fox," Jonathan Acquino, a/k/a "Gotti," and two others participated in a conspiracy to distribute and possess with the intent to distribute one

---

[1] The *Franks* Motion, which has since been placed under seal, was filed as a motion to compel and for the release of *Brady* materials. (Docket Entry 136).

[2] At a pre-trial conference on October 18, 2018, the Court denied the Motion to Strike to the extent it was predicated on the arguments that: (1) the S2 Indictment failed to allege overt acts; and (2) the S2 Indictment did not charge Mercedes's crime with sufficient precision. However, the Court reserved decision on the Motion to Strike pending briefing and, if necessary, disclosure of grand jury transcripts.

hundred grams and more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 846 (the "First Indictment"). On June 4, 2018, a grand jury in this District returned superseding indictment S1 17 Cr. 419 (KMK), which extended the time frame of the conspiracy charged in the First Indictment, charging Mercedes in one count with participating, from at least in or about January 2017 up to and including in or about July 2017, in a conspiracy to distribute and possess with intent to distribute one hundred grams and more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 846 (the "S1 Indictment"). (Docket Entry 87).

During preparation for trial, the Government noticed two inadvertent errors during the June 4, 2018, grand jury presentation, namely, that a witness, DEA Task Force Officer Sean Fogarty, incorrectly testified that

> (1)     the heroin found in the apartment where Acquino was arrested had a red ladybug stamp on it; and
>
> (2)     a person who had witnessed Coleman's drug dealing (the "Witness") told law enforcement officers that the Witness saw Coleman grind heroin and saw Coleman mixing heroin with fentanyl and Oxycontin.

These incorrect statements were immaterial, particularly in light of the overwhelming weight of the evidence in this case. In an abundance of caution, however, the Government decided to present the case to the same grand jury again without the two incorrect statements. On September 26, 2018, following the Government's re-presentation of the case to the grand jury, the grand jury returned superseding indictment S2 17 Cr. 419 (KMK) (the "S2 Indictment"), which was identical in every way (other than the indictment number and the date on which it was returned) to the S1 Indictment. (Docket Entry 122). On September 27, 2018, the day after the grand

2

jury returned the S2 Indictment, the Government told Mercedes's attorney—both by letter and voicemail—about the S2 Indictment and, in the letter, explained what had happened, disclosed the testimonial errors, and noted that, "[y]esterday, TFO Fogarty explained to the grand jury that he was mistaken when he made these two statements." (Docket Entry 130, Ex. A).

That same day, Mercedes moved to dismiss the S2 Indictment, or for additional discovery. (Docket Entries 125, 127) (the "Dismissal Motion").



The following day, the Court held a pre-trial conference at which it decided most of the motions *in limine*, with the exception of Mercedes's Dismissal Motion. While the Court ruled against Mercedes on certain bases of the Dismissal Motion, the Court reserved decision on the Dismissal Motion to the extent it was based on Officer Fogarty's testimony, instead allowing the parties to brief first whether Mercedes was entitled to transcripts of grand jury testimony. Accordingly, the Court gave Mercedes until noon on October 19, 2018, to brief whether he was entitled to grand jury testimony, the Government until October 22, 2018, to respond, and the parties until noon on October 24, 2018, to submit any additional briefing.

On October 22, 2018, Mercedes submitted the *Franks* Motion. In the *Franks* Motion, Mercedes: (1) without reference to any new facts, concludes that "[i]t now appears that what the government presents as an 'error' or 'mistake' … were [*sic*] in fact, material and deliberately misleading statements, made by Sean Fogarty, the only law enforcement officer who testified in the grand juries, which statements resulted in the indictment and superseding indictments" (*Franks* Motion 2); (2) without any reference to new facts or analysis, accuses the Government of "engag[ing] in prosecutorial misconduct by deliberately withholding *Brady* material" (*id.*); (3) accuses the Government of "trying to artfully avoid disclosure of what would otherwise be Section 3500 material adverse to the government's position" by not calling Officer Fogarty (*Franks* Motion 2–3); (4) "requests the disclosure of all grand jury testimony in this case" (*Franks* Motion 3); (5) asserts that Officer Fogarty made three "misleading statements" somewhere in "his affidavits that secured the Title III, search warrants, and arrest warrants in this case" (*id.*); and (6) moves the Court for a *Franks* hearing (*Franks* Motion 4).

Hours after Mercedes submitted the *Franks* Motion, the Government agreed to give the grand jury transcripts to Mercedes and asked the Court to order the release of those transcripts under Federal Rule of Criminal Procedure 6(e)(3)(E), which the Court did. Shortly thereafter, the Government e-mailed copies of the grand jury transcripts to Mercedes's counsel.

Yesterday, on October 23, 2018, the Government disclosed the following to Mercedes by letter:

> Yesterday, the Government e-mailed you three grand jury transcripts, dated June 29, 2017, June 4, 2018, and September 26, 2018. In discussing the identification of your client's phone number(s) on June 29, 2017, Officer Fogarty testified:
>
>> That phone number was a phone number that came over the wire during the course of the wire. I subpoenaed that phone number. When I got that subpoena back, I did what's called a frequency breakdown of that phone number to see who he was speaking to. In doing so, I reached out to an analyst. That phone number had come up in a different case and was actually registered to his mother. And they had identified Leibys Mercedes as the person holding that phone.
>
> (June 29, 2017, Grand Jury Tr. 31–32). To clarify, the Government understands that Officer Fogarty was testifying about two of your client's phone numbers: (929) 309-8315 (which was intercepted over the Title III wiretaps of Christopher Coleman's telephone); and (917) 312-1378 (which was the subject of analysis by the DEA). (*See also* June 8, 2017, Title III Affidavit at 25–27 (explaining the relationship between the 8315 number and the 1378 number)).
>
> Additionally, Officer Fogarty was asked: "Turning to Leibys Mercedes, is it true that he provided his phone number to a United States Probation Officer?" (June 29, 2017, Grand Jury Tr. 47). Officer Fogarty responded: "That is correct." (*Id.*). Again, to clarify, the Government understands that your client told his Probation Officer that he was self-employed by LM Transportation—which was located at his home—and provided the 1378 number as the phone number of LM Transportation.

## III.    Argument

Mercedes appears to argue that: (1) this Court ought to order a *Franks* hearing regarding one or more unspecified affidavits in support of a Title III Wiretap or a search warrant; and (2) the Government has engaged in a pattern of misconduct that likely requires dismissal of one or more of the pending indictments against Mercedes.[5] Mercedes, however, has not pointed to a single intentional and material misrepresentation in any affidavit, and therefore is not entitled to a *Franks* hearing. Moreover, Mercedes's allegations of prosecutorial misconduct appear to be little more than rhetoric. In short, Mercedes's arguments are meritless.

### A.    Mercedes has not met his heavy burden to obtain a *Franks* hearing; indeed, he has not even pointed to a misrepresentation

#### 1.    Applicable Law

In the context of a motion to supress, the content of a search warrant affidavit is generally presumed reliable. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164–72). These circumstances are quite limited; not every statement in a warrant affidavit must be true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). To invoke the *Franks* doctrine, the defendant must demonstrate at an evidentiary hearing, by a preponderance of the evidence, both that there were intentional misstatements or omissions in the search warrant affidavit and that those

---

[5] Mercedes also argues for disclosure of the grand jury minutes. That argument is now moot, as the Government has disclosed those transcripts.

misstatements or omissions were material. *See United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *See id.* "The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

A misstatement or omission is intentional when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717–18. The "reviewing court must be presented with credible and probative evidence that the omission of information … was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (second alteration in original)).

With respect to materiality, a misstatement or omission is material if it is "necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718 (internal citation and quotation marks omitted). To determine if the misinformation was necessary to the probable cause determination, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Id.* (internal citation and quotation marks omitted). If the corrected affidavit supports probable cause, the inaccuracies were not material and suppression is not warranted. *See id.*

In order for a defendant who seeks suppression pursuant to the *Franks* doctrine to trigger an evidentiary hearing, he must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant

in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. For a court "to award an evidentiary hearing" on the basis of *Franks*,

> The challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*United States v. Brown*, 676 F. Supp. 2d 220, 226 (S.D.N.Y. 2009) (quoting *Franks*, 438 U.S. at 171).

As a result, "[t]he burden to obtain [a *Franks*] hearing is a heavy one, and such hearings are exceedingly rare." *United States v. Melendez*, 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016); *see also United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) ("Hearings under *Franks* are not freely granted."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *cf. also United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held."). "[T]he defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States v. Levasseur*, 816 F.2d 37, 43–44 (2d Cir. 1987) (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)).

8

### 2.    Discussion

In order to meet his "heavy" burden to get a *Franks* hearing, *Melendez*, 2016 WL 4098556, at *7, Mercedes must: (1) offer "[a]ffidavits or sworn or otherwise reliable statements of witnesses … or [explain] their absence satisfactorily"; (2) allege "deliberate falsehood or … reckless disregard for the truth, … accompanied by an offer of proof"; (3) "point out specifically the portion of the warrant affidavit that is claimed to be false, … accompanied by a statement of supporting reasons"; (4) not be conclusory in his attacks; and (5) not allege mere "negligence or innocent mistake." *Franks*, 438 U.S. at 171. Moreover, any misstatements made deliberately or in reckless disregard for the truth must be "'necessary to the [issuing] judge's probable cause finding.'" *Canfield*, 212 F.3d at 718 (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)). Mercedes has not done any of these, much less all of them, as he must to merit a *Franks* hearing.

Rather, Mercedes, in an utterly conclusory fashion, purports to quote three lines from unspecified affidavits, one of which appears to be made up from whole cloth:

> Finally, upon review of the 3500 material made available to the defendant on October 18, 2018,[6] it appears that SA Sean Fogarty, may have made similar misstatements in his affidavits that secured the Title III, search warrants, and arrest warrants in this case, as he admittedly made to the grand jury. The misleading statements that Sean Fogarty made in the affidavits may be as follows:
>
> "CS-1 made a controlled buy of heroin stamped with a red insect, from Acquino on January 1, 2017";

---

[6] As discussed extensively at the October 18, 2018, pre-trial conference, the Government provided Mercedes with its disclosures under Federal Rule of Criminal Procedure 26.2 and 18 U.S.C. § 3500 on October 5, 2018.

"Law enforcement believes that Coleman is purchasing Heroin from Acquino"

"CS-1 has informed law enforcement that CS-1 was present when Coleman bought Heroin from Acquino."

Based upon admitted misstatements to this grand jury, ████████████

████ and my review of the 3500 disclosure, there is a reasonable basis to believe that the above statements contained in the affidavits of Sean Fogarty are materially and deliberately misleading.

(*Franks* Motion 3–4). This does not satisfy Mercedes's heavy burden. Mercedes does not even identify in what affidavits these purported misstatements appear, much less why or how they are false, the basis for Mercedes's claim of falsity, why any falsity was either deliberate or made in reckless disregard for the truth, what reasons support Mercedes's claims, and why the purported misstatements are material. Each of these failures, on its own, would be fatal to Mercedes's request for a *Franks* hearing; together, they demonstrate conclusively that he is not entitled to such a hearing.

It makes sense to discuss the purported misstatements in two groups: the purported misstatement about the controlled buy and the purported misstatements about law enforcement's belief that Acquino supplied heroin to Coleman.

> a.   **"CS-1 made a controlled buy of heroin stamped with a red insect, from Acquino on January 1, 2017."**

The Government has reviewed the affidavits in support of both Title III wiretaps on Acquino's telephones, both Title III wiretaps on Coleman's telephones, and the search warrants in this case, and has been unable to find this statement in any of them. The Government contacted Mercedes's attorney, who declined to identify the affidavit in which this misstatement is supposed to appear.

10

That said, the investigation of this drug-trafficking organization did include controlled buys, which occurred later in January 2017. In those buys, the baggies were in fact stamped with a red insect.

>   **b.    "Law enforcement believes that Coleman is purchasing Heroin from Acquino," and "CS-1 has informed law enforcement that CS-1 was present when Coleman bought Heroin from Acquino."**

Mercedes appears to refer to the following statements, which were in the first affidavit in support of a Title III wiretap on Acquino's phone, on which Mercedes was never intercepted:

>   Law enforcement believes that COLEMAN is purchasing heroin from TARGET SUBJECT JONATHAN ACQUINO and using call number 646-406-8384, amongst others, to do so.
>
>   CS-1 has informed law enforcement that CS-1 has been present when COLEMAN has purchased heroin from ACQUINO. CS-1 was shown a photo of COLEMAN, and CS-1 confirmed that CS-1 had seen the pictured individual purchase heroin from ACQUINO.

(First Acquino Affidavit at 18). [7] There is no reason to believe that these statements were inaccurate, and Mercedes does not explain otherwise. [8] Nor is there any reason to believe that these

---

[7] There were four Title III wiretap orders issued in this case, based on four affidavits: (1) an affidavit executed by Officer Fogarty on February 21, 2017, for one of Acquino's phones (the "First Acquino Affidavit"); (2) an affidavit executed by one of Officer Fogarty's colleagues on March 30, 2017, for one of Acquino's phones (the "Second Acquino Affidavit"); (3) an affidavit executed by Officer Fogarty on May 2, 2017, for one of Coleman's phones (the "First Coleman Affidavit"); and (4) an affidavit executed by one of Officer Fogarty's colleagues on June 8, 2017, for one of Coleman's phones (the "Second Coleman Affidavit").

[8] Indeed, while intercepted calls indicated, over time, that Coleman primarily supplied Acquino, and not the other way around, Acquino did, on occasion, provide heroin to Coleman, particularly to return heroin when it was not of high quality. (*See*, *e.g.*, GX 501T (transcript of call in which Acquino discusses returning heroin to Coleman)). A confidential source seeing such a transaction could reasonably report that the source understood Acquino to be selling heroin to Coleman.

11

statements were material, much less sufficiently material that, without them, a judge would not have authorized a Title III wiretap of Acquino's phone. But there are additional issues that Mercedes does not address.

First, Mercedes would not have standing to challenge the Title III wiretap of Acquino's phone in the first place. "Congress has provided only that an 'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of" Title III. *Alderman v. United States*, 394 U.S. 165, 175 n.9 (1969) (citing 18 U.S.C. § 2518(10)(a)). An "aggrieved person" is "a person who was a party to any intercepted … communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Accordingly, "[s]tanding to challenge evidence obtained through the use of electronic surveillance techniques requires a showing by a defendant that his or her voice was heard on the wire or that his or her telephone was tapped." *United States v. Burford*, 755 F.Supp. 607, 609 (S.D.N.Y. 1991) (citing *United States v. Fury*, 554 F.2d 552, 525 (2d Cir. 1977)). Here, Mercedes was not intercepted on the Title III wiretap of Acquino's phones, nor was he a target subject named in the Title III applications for those phones. Even if there were an intentional and material misstatement, therefore, Mercedes would not be entitled to complain of it and get a *Franks* hearing.[9]

Second, even if there were a misstatement about the flow of drugs between Acquino and Coleman, it would be utterly immaterial. As long as there is probable cause to believe that they

_____

[9] The Second Circuit, moreover, has made clear that standing does not travel downstream; that is, the fact that Mercedes was intercepted on the Title III wiretap on Coleman's phone, and that wiretap was based, in part, on interceptions from the Title III wiretap on Acquino's phone, does *not* give Mercedes standing to seek to suppress the Acquino wiretap. *Fury*, 554 F.2d at 526.

were conspiring to distribute heroin, and using Acquino's phone in furtherance of that conspiracy, there was sufficient probable cause to tap Acquino's phone, irrespective of who supplied whom. (Moreover the affidavit demonstrated overwhelming probable cause, and did not rely entirely on these two statements).

Third, once law enforcement intercepted communications pursuant to the first Acquino wiretap indicating that, in fact, Coleman primarily supplied Acquino, Officer Fogarty and his colleagues *told the Court*. In particular, in the affidavit in support of the second Title III wiretap of Acquino's phone, on of Officer Fogarty's colleagues stated: "Based on my experience, training, and investigation of this matter, I believe that ACQUINO and COLEMAN were discussing the heroin that COLEMAN had supplied to ACQUINO and that ACQUINO's customers were complaining about, and COLEMAN was arranging to provide new heroin to ACQUINO." (Second Aquino Affidavit at 21). Indeed, although the First Acquino Affidavit was incorporated into the affidavits for the Title III wiretaps of Coleman's phone, so, too, was the Second Acquino Affidavit. Accordingly, to the extent that, in the earlier affidavit, Officer Fogarty had recounted a source's statement that the source saw Acquino sell heroin to Coleman, Officer Fogarty and his colleagues made clear that, based on intercepted communications, law enforcement believed that Coleman was supplying heroin to Acquino. Indeed, in the affidavits in support of the Title III wiretaps of Coleman's phone—on which Mercedes was intercepted—one of Fogarty's colleagues explained: "Based on the ACQUINO Wiretaps, among other things, I believe that ACQUINO operates as a distributor of narcotics—specifically, heroin—in and around Westchester County, New York and that TARGET SUBJECT CHRISTOPHER COLEMAN, a/k/a "Fox," supplies ACQUINO with heroin that COLEMAN in turn obtains from a source of supply in Bronx County, New York."

13

(First Coleman Affidavit at 14 (Officer Fogarty as affiant); *see also* Second Coleman Affidavit at 14 (one of Officer Fogarty's colleagues as affiant) (same, except explaining that the conclusion is now based, as well, on the Coleman wiretap, and that the agents had learned that Coleman had two sources of supply: Mercedes and James Odell Whitted)).

In short, Mercedes not only speaks only in a conclusory fashion, and offers no evidence—or even offer of proof—but he gives this Court no reason to believe that the statements were false, much less deliberately or recklessly so, or that they were material. To the contrary, the affidavits demonstrate a careful explanation of the evidence as it accumulated.

### B.  The Government has not engaged in misconduct

#### 1.  Mercedes's claims of misconduct are speculative and baseless

The Government has acted forthrightly, with this Court, the grand jury, and Mercedes. Mercedes has found no errors that the Government did not affirmatively point him to, and that the Government did not correct on the record. Mercedes has offered nothing beyond sheer speculation that any errors were intentional, and has not explained why any errors were material, particularly in light of the fact that the grand jury returned superseding indictments against him based on clarified, more accurate information. Nonetheless, Mercedes issues a bevy of accusations, claiming, without any basis beyond mere *ipse dixit*, that: "what the government presents as an 'error' or 'mistake' … were in fact, material and deliberately misleading statements" (*Franks* Motion 2); "the United States Attorney's [*sic*] have engaged in prosecutorial misconduct by deliberately withholding Brady material" (*Franks* Motion 2); and (3) "[b]y maneuvering to prevent the disclosure of Sean Fogarty's grand jury testimonies, the government is trying to artfully

avoid disclosure of what would otherwise be Section 3500 material adverse to the government's position" (*Franks* Motion 2–3). Each accusation is meritless.

First, Mercedes offers no basis to believe that Officer Fogarty's mistaken testimony about stamps on heroin seized at Acquino's apartment and whether a witness saw Coleman grind heroin with oxycontin and fentanyl versus simply seeing "Coleman with a mask and with materials next to him on the table" (September 26, 2018, Grand Jury Tr. 41–42) was "in fact, material and deliberately misleading." (*Franks* Motion 2). This testimony, which related to the undisputed fact that Coleman and Acquino were moving heroin, was utterly immaterial. That is made most obvious by the fact that the Government re-presented the case to the grand jury, explicitly excising this testimony, and the grand jury still returned an indictment against Mercedes. In fact, the explanatory testimony—which the Government elicited without prompting from Mercedes or the Court but because it was attempting to be open and honest with the grand jury—makes this clear:

> Q.    Detective Fogarty, moving away from the transcript, when you testified on June 4th, 2018, did you testify that there were bundles of heroin recovered from Acquino's apartment on July 6th, 2017?
>
> A.    I did.
>
> Q.    And did you testify that those bundles of heroin had a ladybug stamp on them?
>
> A.    I did.
>
> Q.    Have you been able to take a closer look at the bundles of heroin since then?
>
> A.    Yes.
>
> Q.    When you looked at the heroin more recently, did you see a ladybug stamp?

15

A.      No, I did not.

Q.      So was your testimony that there was a ladybug stamp on the bundles incorrect?

A.      That's correct.

Q.      Additionally, when you previously testified before the grand jury, did you testify that [the Witness] told law enforcement she had seen Coleman grind heroin herself?

A.      That's correct.

Q.      In fact, did [the Witness] tell law enforcement that she saw Coleman with a mask and with materials next to him on the table?

A.      That's correct.

Q.      So your testimony that she had seen—specifically seen Coleman grind heroin, was that incorrect?

A.      Incorrect.

Q.      And did you also testify previously that [the Witness] told law enforcement she had seen Christopher Coleman grind the heroin with fentanyl and OxyContin?

A.      I did.

Q.      Have you had a chance to discuss and review with law enforcement what [the Witness] had told the government in her proffer sessions?

A.      Yes, I did.

Q.      Did she in fact testify that she had seen Coleman grind heroin with fentanyl and OxyContin?

A.      She did not.

Q.      So your statement previously to the grand jury was incorrect?

A.      That's correct.

16

(September 26, 2018, Grand Jury Tr. 41–42). Moreover, there is nothing about the error—which was immaterial and discussed the conspiracy, but not Mercedes personally, and which Officer Fogarty voluntarily corrected at a subsequent grand jury presentation—that indicates that it was in any way deliberate.

In response, Mercedes sets forth the reasons he believes these immaterial misstatements were material and deliberate:

> Not to put too fine a point on it, it is clear that SA Fogarty lied to the grand jury in this case. Based on my review of the 3500 material,[10] the misstatements that he admitted to before the third grand jury convened on September 26, 2018, are so material and intricately interwoven with the narrative of the prosecution that it would require a suspension of disbelief to say that they were mere "errors" as the government claims. The reference to the ladybug stamp is found through out [*sic*] the investigation reports filed by SA Fogarty in this case and is used to show the source of the heroin thus stamped. The misrepresentation regarding Witness-1's statement is obviously calculated to provide a missing element of the offense charged in the indictment where such element was not otherwise present.

(*Franks* Motion 2). At most, however, Mercedes explains why the presence of ladybug stamps on bundles of heroin at Acquino's apartment would have been *relevant*, not why the erroneous testimony was material.[11] And Mercedes cannot even explain what "missing element of the offense charged in the indictment" was not present, much less how the Witness saying that she saw Coleman with a mask and materials next to him on a table did not establish that element

---

[10] Mercedes does not point to any 3500 material.

[11] Notably, an actual ladybug stamp was found during the court-authorized search of Coleman's apartment.

whereas seeing Coleman actually grind the heroin would. And Mercedes continues to avoid the elephant in the room: if these statements were material, why did the grand jury return the same indictment after the statements were corrected, and if they were deliberate, why did Officer Fogarty correct them?

Second, Mercedes's claim that the Government is engaging in "prosecutorial misconduct" by withholding *Brady* material (*Franks* Motion 2) is equally baseless. Mercedes does not identify any material that is exculpatory or otherwise favorable to Mercedes that the Government withheld.[12] To the contrary, the only material of which Mercedes complains is material that the Government provided to Mercedes. In short, Mercedes has failed to identify material evidence favorable to him, suppression of that evidence by the Government, or prejudice. Mercedes has therefore failed to identify any *Brady* violation.

Third, Mercedes argues that the Government "maneuver[ed] to prevent the disclosure of Sean Fogarty's grand jury testimonies [in order] to artfully avoid disclosure of what would otherwise be Section 3500 material adverse to the government's position." (*Franks* Motion 2–3). This argument is wrong on several levels. ███████████████

---

[12] As this Court is well-aware, there are three components to a *Brady* violation: [1] the material evidence "must be favorable to the accused, either because it is exculpatory or because it is impeaching; [2] that evidence must have been suppressed … either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Green*, 527 U.S. 263, 281–82 (1999). "[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if [the defendant] or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *Kyles v. Whitley*, 514 U.S. 419, 505 (1995); *accord Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). *Brady* does not demand an "open file" policy or give the defendant the right to search through the prosecution's files for potentially relevant information. *See Kyles*, 514 U.S. at 437.

However: (1) as the Government has explained to both the Court and Mercedes, it never intended to call Officer Fogarty as a witness; (2) the Government disclosed 3500 materials a week-and-a-half before October 16, 2018; (3) ████████████████████████████ ████████████████████████████████████████ (4) the Government disclosed Officer Fogarty's erroneous grand jury testimony to Mercedes on September 27, 2018, before it even disclosed 3500 material to Mercedes; and (5) the Government agreed to disclose Officer Fogarty's grand jury testimony to Mercedes—and asked this Court for an order allowing it to do so—even though Mercedes failed to cite a single case in the *Franks* Motion that would have required such disclosure. Moreover, to the extent that Mercedes is attempting to argue that, to the extent that the Government has *Brady* materials—or *Giglio* or Rule 26.2/3500 materials regarding witnesses the Government *is* calling—that the Government is withholding those materials on the basis that such materials would *also* constitute Rule 26.2/3500 materials for Officer Fogarty, such an argument is not only speculative, but ridiculous. Indeed, as the Government explained at the October 18, 2018, pre-trial conference, it has already turned over materials in its 3500 disclosures for other witnesses that would also constitute Rule 26.2/3500 materials for Officer Fogarty. The Government is aware of its obligations, and Mercedes offers no evidence otherwise.

In short, Mercedes's broad claims of pervasive prosecutorial misconduct are speculative, baseless, and should be quickly dismissed.

**2.      Mercedes has suffered no prejudice from Officer Fogarty's imprecise testimony before the June 29, 2017, grand jury about his identification of Mercedes's phone number**

In his testimony before the grand jury on June 29, 2017, Officer Fogarty testified in a manner that was imprecise and potentially confusing about how he identified Mercedes's phone number. In particular, Officer Fogarty testified:

> That phone number was a phone number that came over the wire during the course of the wire. I subpoenaed that phone number. When I got that subpoena back, I did what's called a frequency breakdown of that phone number to see who he was speaking to. In doing so, I reached out to an analyst. That phone number had come up in a different case and was actually registered to his mother. And they had identified Leibys Mercedes as the person holding that phone.

(June 29, 2017, Grand Jury Tr. 31–32). Officer Fogarty was, in fact, testifying about two of Mercedes's phone numbers: the 8315 number (which was intercepted over the Title III wiretaps of Christopher Coleman's telephone); and the 1378 number (which was the subject of analysis by the DEA). Additionally, Officer Fogarty testified that Mercedes "provided his phone number to a United States Probation Officer," but did not state which phone number (the 1378 number) Mercedes provided. (June 29, 2017, Grand Jury Tr. 47).

This imprecise testimony was clearly unintentional. At the time that Officer Fogarty testified, he could easily have explained why he saw *both* numbers as Mercedes's phone number, and so an analysis of one necessarily implicated the other. The evidence of this is simple: Officer Fogarty's colleague, in fact, did give such an explanation in the Second Coleman Affidavit three weeks before Officer Fogarty testified, which detailed explanation was, apparently, accepted by the Honorable Cathy Seibel, United States District Judge, who authorized the Title III wiretap:

For the following reasons, law enforcement believes that the user of the call number ending in 8315—who identified himself as "Celly"—is TARGET SUBJECT LEIBYS MERCEDES, a/k/a "Celli," a/k/a "Celly," a/k/a "Sonny." A confidential source ("CS-1") told law enforcement that COLEMAN has identified to CS 1 COLEMAN's heroin supplier as "Celli." CS-1 further provided law enforcement with a call number ending in 1378 as the phone number for "Celli." DEA records list the call number ending in 1378 as the phone number for MERCEDES, who has prior convictions for, amongst other crimes, conspiracy to distribute heroin in violation of Title 21, United States Code, Sections 841 and 846. COLEMAN's toll records from before the First COLEMAN Wiretap show contact between COLEMAN and the call number ending in 1378.

In addition, MERCEDES is currently on federal supervised release, which he violated when, on or about April 19, 2017, he was arrested on New York state assault and weapons charges. MERCEDES was initially detained but on May 15, 2017, he was released on bail. On or about May 14, 2017—a day before MERCEDES was released— at approximately 6:14 p.m., COLEMAN received a text message from a call number ending in 2309 (Session 2209), which read: "Was up bro, this is L Bro hit me when u can." COLEMAN responded: "Celly??" (Session 2210). The user of the call number ending in 2309 responded: "Yes" (Session 2211). COLEMAN then placed an outgoing call to the call number ending in 2309 (Session 2212), in which the user of that call number identified himself as "Sonny's" brother and described "Sonny's" legal situation in a manner consistent with that of MERCEDES at the time. In addition, the text message "this is L Bro" is consistent with the user of the call number ending in 2309 being the brother of LEIBYS ("L") MERCEDES. In this May 14, 2017 call, COLEMAN and the user of the call number ending in 2309 further discussed money that COLEMAN owed to "Sonny," as well as "Sonny's" instruction to his brother that COLEMAN could be trusted for the money. This conversation dovetails with the May 17, 2017 call transcribed above (Session 3110), in which "Celly" and COLEMAN discuss money owed by COLEMAN to "Celly," COLEMAN's earlier conversation with "Celly's" brother about that money, and "Celly" having told is brother that COLEMAN was good for the money. For all of these reasons, law enforcement believes that the user of the call number ending in 8315—who identified himself as "Celly" in the May 17, 2017 call—is MERCEDES and that MERCEDES was previously supplying COLEMAN with heroin.

(Second Coleman Affidavit at 25–27). So any imprecision in Officer Fogarty's testimony arising from his failure to segregate the 1378 number and the 8315 number and explain their relationship would clearly be inadvertent, as there was no need for such imprecision.

Moreover, even if there were prejudice from confusion based on Officer Fogarty's imprecise testimony, that prejudice would have been cured not once, but twice, as Officer Fogarty explained, in detail, in two subsequent grand jury presentations why the 8315 number—that is, the number intercepted on the Coleman Title III wiretap—was used by both Mercedes and Mercedes's brother. (June 4, 2018, Grand Jury Tr. 18–29; September 26, 2018, Grand Jury Tr. 18–30).

## IV.   Conclusion

For the foregoing reasons, the Court should deny Mercedes' motions and proceed to trial on October 29, 2018.

Dated: White Plains, New York
         October 24, 2018

Respectfully submitted,
GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:    /s/ Michael D. Maimin
       Samuel L. Raymond
       Daniel Loss
       Michael D. Maimin
       Assistant United States Attorneys
       (914) 993-1946 / 1924 / 1952
