UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>– v. –<br><br>LEIBYS MERCEDES,<br>a/k/a "Celly,"<br><br>Defendant. | 17 Cr. 419 (KMK) |

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT LEIBYS MERCEDES'S
MOTION FOR A JUDGMENT OF ACQUITTAL**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Samuel L. Raymond
Daniel Loss
Michael D. Maimin
Assistant United States Attorneys
 - *Of Counsel* -

# **TABLE OF CONTENTS**

I.    Preliminary Statement ............................................................................................... 1

II.   Background ................................................................................................................. 2

    A.    The Indictment and Charge ............................................................................. 2

    B.    The Government's Case .................................................................................... 3

    C.    The Defense Case ............................................................................................. 8

III.  This Court Should Deny Mercedes's Rule 29 Motion ............................................... 9

    A.    Applicable Law ................................................................................................ 9

    B.    Discussion ...................................................................................................... 11

        1.    The Evidence Was Sufficient to Permit a Rational Trier of Fact to
            Find Mercedes Guilty .......................................................................... 11

        2.    Mercedes Does Not Overcome His Heavy Burden in Seeking to
            Overturn the Jury's Verdict ................................................................. 15

IV.  Conclusion ............................................................................................................... 19

# I.  Preliminary Statement

The Government respectfully submits this opposition to Leibys Mercedes' motion for a judgment of acquittal.

Over three days, a jury heard and saw overwhelming evidence that Mercedes supplied Christopher Coleman with hundreds of grams of heroin; testimony that included 16 witnesses—including Lisa Henderson, who testified that Mercedes was Coleman's heroin supplier—dozens of intercepted telephone calls and text messages in which Mercedes and his co-conspirators discussed drugs and drug transactions, GPS and cell-site location data corroborating the heroin-related transactions discussed on the intercepted calls and messages, heroin found at Coleman's house—which Mercedes and Coleman had discussed on intercepted calls—and over $13,000 in cash—nearly the precise price of the drugs found at Coleman's house—in Mercedes's coat pocket. In short, the evidence demonstrated, well beyond a reasonable doubt, that Mercedes agreed to supply Coleman with hundreds of grams of heroin. The jury appropriately found Mercedes guilty.

In spite of the overwhelming evidence, Mercedes argues that he is entitled to a judgment of acquittal, making two arguments. First, Mercedes argues, without any analysis of the evidence, and as mere *ipse dixit*, that "[t]he evidence adduced by the government did not show that Coleman purchased illegal drugs from Mercedes and was utterly insufficient to show that Mercedes joined in a conspiracy to distribute [h]eroin" and "the testimony of Lisa Henderson [Coleman's girlfriend] was insufficient to connect Leibys Mercedes to the Coleman/Acquino conspiracy to distribute [h]eroin." (Br. 5–6).[1] Second, Mercedes argues that there was insufficient evidence to demonstrate

---

[1] "Br." refers to Mercedes's Motion for a Judgment of Acquittal accompanying Memorandum of Law in Support of Motion for a Judgment of Acquittal. (Docket Entry 150). That document does

that Mercedes actually or constructively possessed the heroin found at Coleman's home, which possession is "[a]n essential element" of the offense of conviction. (Br. 6–7).

Mercedes's first argument is wrong as a matter of fact: there was sufficient evidence for a jury to find that Mercedes participated in a conspiracy to distribute heroin; indeed, the law is clear that the testimony of a single witness, such as Henderson, is sufficient to permit a jury to convict Mercedes. Mercedes's second argument is wrong as a matter of law: actual or constructive possession of heroin is not an element of the crime of conviction.

This Court should deny Mercedes's motion.

## II. Background

### A. The Indictment and Charge

On September 26, 2018, a grand jury in this District returned superseding indictment S2 17 Cr. 419 (KMK), which charged Mercedes, in one count, with participating in a conspiracy to violate the narcotics laws of the United States—in particular, to distribute and possess with intent to distribute 100 grams and more of heroin, in violation of 21 U.S.C. § 841(b)(1)(B)—in violation of 21 U.S.C. § 846.

As the Court charged the jury, there are two "essential elements" of this charge: "First, that two or more persons entered into the unlawful agreement charged in the indictment from in or about January 2017 to in or about July 2017; and second, that the defendant knowingly and

---

not contain page numbers; accordingly, this memorandum will refer to the page numbers assigned by the CM/ECF system.

willfully became a member of the conspiracy." (Tr. 433).[2] "In this instance, the unlawful purpose alleged to be the object of the conspiracy … is the distribution of a controlled substance, or the possession of a controlled substance with the intent to distribute it." (Tr. 434). In order to trigger the enhanced sentencing scheme of 21 U.S.C. § 841(b)(1)(B), moreover, the jury had to find that the controlled substance was 100 grams and more of heroin. (Tr. 442).

### B.     The Government's Case

In October and November 2015, Coleman shared a room with Mercedes—his "celly" or "bunkie" or "roomie" (Tr. 68)—at a federal halfway house. (Tr. 66–70; GX 818A–B). After Coleman was released from the halfway house, he began distributing weight-quantities of heroin. (Tr. 69–60, 131, 133–34, 161–62). Coleman's supplier—his "Bronx plug"[3]—was Mercedes. (Tr. 130–131, 169–175).[4] At least three times, Coleman drove to the Bronx to purchase between $8,000 and $10,000 of heroin—between about 123 grams and 153 grams[5] each time—from Mercedes, bringing his girlfriend, Lisa Henderson, with him. (Tr. 173–74). Indeed, at one point,

---

[2] "Tr." refers to the trial transcript in this case; "GX" refers to a Government exhibit admitted at trial in this case.

[3] A "plug" is a drug supplier. (Tr. 56–57, 131).

[4] Coleman referred to Mercedes as "Celly," whether speaking with his girlfriend or on the phone. (Tr. 130–31, 169–75, 177, 211; GX 603, 604). Coleman, however, introduced his girlfriend to Mercedes as "Celly." (Tr. 169–70). Cell-site data showed that the phone used by "Celly" was near Mercedes's home. (GX 430 at 10, 12). And when "Celly Bro" described "Celly" (Tr. 211, GX 517), he described Mercedes's legal situation to a tee (Tr. 85–87, 195–99, 207–09; GX 813–17). "Celly" also called himself "L," which would be short for Leibys. (GX 603). Not to mention that Mercedes had, in fact, been Coleman's "celly" at the halfway house. (Tr. 66–70; GX 818A–B).

[5] "In Yonkers, for loose, raw heroin, a gram would probably be around $65." (Tr. 51).

Coleman had trouble getting in contact with Mercedes—he believed that Mercedes "got into a domestic dispute with a girlfriend and that he was arrested" (Tr. 174)[6]—and arranged to get his heroin from a Newburgh supplier who Coleman called "O." (Tr. 174–77). However, "O" gave Coleman a "bad batch," and Coleman went back to Mercedes. (Tr. 177).

In May through July 2017—as verified by intercepted calls and text messages, as well as cell-site and GPS data—Coleman and Mercedes arranged to meet at least four times:[7]

- **May 19, 2017**. On May 14, 2017, while Mercedes was still in jail, Coleman told a man who called himself "Celly Bro" that he owed Mercedes $1,300, and said that he wanted to pay him back, at least in part. (GX 517). On May 17, 2017, just after Mercedes was released, Coleman called Mercedes, discussing the money he owed Mercedes, and saying "I should, I should have that Friday." (GX 518). On Friday, May 19, 2017, Coleman again called Mercedes, to say that, although he "kn[e]w we had 13"—*i.e.*, he knew he still owed Mercedes $1,300—"[i]f you want to come get a rack [$1,000[8]] right now, you could come, or I'll bring it to you later." (GX 520). Mercedes told Coleman to come to Mercedes later that day. (GX 520). Just before 9:00 pm, Coleman went to

---

[6] "Celly Bro" told Coleman that Mercedes was arrested after a dispute involving his child's mother. (GX 517).

[7] Coleman and Mercedes contacted one another by phone over 100 times in March and April 2017 as well. (GX 430). However, Coleman's phone was not wiretapped at the time, so the jury could not hear the content of those communications.

[8] "Rack" refers to $1,000. (Tr. 55).

Mercedes's neighborhood in the Bronx, presumably to pay Mercedes the $1,000, as Coleman called Mercedes to say "Yo, I'll be there in two minutes." (GX 521, 430 at 10).

- **May 23, 2017**. On May 23, 2017, Coleman texted Mercedes that he was "here" when he arrived in Mercedes's neighborhood, approaching Mercedes himself. (Tr. 325–26; GX 605, 430 at 11–12). Just over half an hour later, Coleman texted Mercedes that he was "safe," and Mercedes was relieved, saying "good." (GX 605). The implication that Coleman had picked up heroin from Mercedes, and let him know he was "safe" after he got home unmolested was cemented six days later, when Mercedes and Coleman texted clearly about heroin, with Mercedes asking Coleman if "it [is] working good" and Coleman responding that he "didn't crack it yet"—*i.e.*, he had not begun using the last supply of heroin Mercedes gave Coleman—because "[i]t's always like this [slow] at the end of the month," but offering Mercedes "a stack if u need it though." (GX 604). However, Coleman assured Mercedes that, "if it's the same" as the quality of the prior heroin shipment, "then it will be fine." (GX 604).

- **June 19, 2017**. On June 12, 2017, Coleman texted Mercedes to tell him that he was hoping to pay Mercedes for some of the heroin, or return it, but did not have money yet because business had been slow enough that he had not yet begun using the last supply of heroin:

  > My fault Celly … I hope by Saturday latest. Shit B[een] slow. I
  >
  > B[een] working on what I have … I didn't crack it yet because I still

5

have but I was gonna pay u off that. No need to crack it yet but I can

bring it back if u want I didn't touch it. Or I can give a few dollars.

…

(GX 604). One week later, Coleman told Mercedes: "I have a couple bands for

u if u want Celly." (GX 604). Mercedes made clear that he wanted money to

pass on to his own suppliers: "Hell yea i[']ll take that so i could pass it on."

(GX 604). Coleman then asked Mercedes to come to Coleman's home to pick

up the money. (GX 604). One minute later, Coleman called his one of his drug

distributors, Jonathan Acquino,[9] to ask for $100, explaining that "I told him

[Mercedes] I had a couple racks for him. I'm at 1900." (GX 524). In other

words, Coleman had promised Mercedes $2,000 ("couple bands" and "couple

racks") in partial payment for an earlier supply of heroin, but realized he was

$100 short, so he needed his heroin distributor to make up the difference. After

Mercedes agreed to come to Coleman's home, and Coleman texted Mercedes

his address (GX 604), Coleman thought twice about what he had done, and

texted his concern to a heroin-trafficking mentor,[10] asking for "[a] piece of

advice": "Ain't nothing wrong with letting a plug come to the crib, right?"

---

[9] Without detailing the evidence here, Mercedes admits that, "[a]ccording to the evidence, Coleman was a middle[-]level supplier of [h]eroin who sold [h]eroin to Acquino who then sold the same drugs to end users on the street." (Br. 3).

[10] Elsewhere in the call, Coleman speaks with his mentor about whether to mix heroin with fentanyl or oxycodone, and how fentanyl is affecting the heroin market. (GX 525).

(GX 525). Although Coleman's mentor advised against it (GX 525), it was too late (GX 604). Mercedes went to Coleman's home, meeting him to get his money about an hour later. (GX 604, 430 at 13–14).

- **July 3, 2017**. By the turn of the month, Coleman needed more heroin, so, on July 2, 2017, he texted Mercedes, asking him: "What up Celly..can u come check me today?" (GX 604). The following day, July 3, 2017, Mercedes responded: "You want me to go now," and Coleman said: "Sure." (GX 604). Minutes later, Coleman—apparently relieved—made sure that Acquino, his heroin distributor, knew that he was getting more heroin: "my man about to come see me." (GX 559). And Coleman's man—Mercedes—did come see Coleman. Just half an hour after Coleman spoke with Acquino, Mercedes showed up in Yonkers, by Coleman's home, texted Coleman: "3 min," and Coleman asked Mercedes: "Can u come up." (GX 604, 430 at 15–16). About an hour later, Coleman again called Acquino, explaining: "My man just came to see me too. Just gave me 25 right now." (GX 562). Coleman was "relieved, that relieved a lot of stress." (GX 562).

In the early morning of July 6, 2017—less than three days after Mercedes supplied Coleman with his latest batch of heroin, law enforcement officers arrested Coleman and Mercedes in their respective apartments. (Tr. 228–29, 261–71). In Coleman's apartment, they found, among

7

other things, approximately 208 grams of heroin[11] and narcotics paraphernalia (Tr. 261–263, 265–268, 271, 285–286, GX 706, 708–10, 713). At $65 per gram,[12] that was $13,520 worth of heroin.

Mercedes's apartment was fortified, with a large, opaque iron fence, security cameras, and two security doors. (Tr. 222–24; GX 35–43). Law enforcement eventually breached all the doors and entered, finding Mercedes at the back of a hallway by a stairwell. (Tr. 225–26). Mercedes consented to a search of his apartment, which did not include the area up the stairs from which he came when he was found. (Tr. 228, 231–32). While agents did not find any drugs in Mercedes's apartment, they did find $13,530 in cash in his jacket pocket in the closet. (Tr. 229–32; GX 10, 219).

## C.      The Defense Case

The defendant did not put on an affirmative case, instead relying on vigorous cross-examination of witnesses and arguments about what the evidence did and did not show.

---

[11] Mercedes repeatedly refers to law enforcement finding "153 grams" of heroin at Coleman's apartment. (Br. 3, 6–7). This is incorrect. Law enforcement found bags with beige powder in it. (Tr. 268–69, 285–88; GX 713). A forensic scientist tested two separate groups of samples from what law enforcement found: (1) the knotted plastic bags and ziplock bags; and (2) two food saver bags containing beige powder. (Tr. 285). He determined that the first group contained approximately 153.346 grams of heroin and the second group contained approximately 54.503 grams of a mixture of heroin and fentanyl, for a total of 207.849 grams of mixtures and substances containing a detectable amount of heroin. (Tr. 285–86).

[12] "In Yonkers, for loose, raw heroin, a gram would probably be around $65." (Tr. 51).

### III.    This Court Should Deny Mercedes's Rule 29 Motion

#### A.    Applicable Law

The standard on a Rule 29 motion for acquittal is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence must be viewed "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) (internal quotation marks omitted). In assessing the sufficiency of the evidence, a reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). The Court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006) (internal quotation marks omitted), because "the task of reviewing among competing, permissible inferences is for the [jury], not for the court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Accordingly, where there are competing inferences, the Court must defer "to the jury's choice." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). Notably, "the government's evidence need not exclude every other possible hypothesis." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citations omitted). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105 (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

With respect to a conspiracy conviction, these deferential standards are "especially important … because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted); *accord, e.g., United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010). "[E]ven the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face or does not def[y] physical realities." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation marks and citation omitted). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted). Accordingly, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

A conspiracy is an "agreement among two or more persons to join in a concerted effort to accomplish an illegal purpose." *United States v. Bayer*, 331 U.S. 532, 542 (1947). For the Government to prove a conspiracy, the evidence must show that "two or more persons agreed to participate in a joint venture intended to commit an unlawful act." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997). "Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal." *United States v. Labat*, 905 F.2d 18,

21 (2d Cir. 1990). Thus, so long as the participants in the conspiracy intended to distribute the specified narcotics with the specified quantities, a conspiracy conviction must be upheld even if "there is insufficient evidence that the conspiracy actually distributed" the specified quantity of the specified drug. *See, e.g.*, *United States v. Arroyo*, 477 F. App'x 771, 773 (2d Cir. 2012). One relevant factor probative of guilt in a narcotics conspiracy is "large quantities of cash." *United States v. Diaz*, 878 F.2d 608, 619 (2d Cir. 1989); *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir. 1975) ("[t]he possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means.").

## B.     Discussion

### 1.     The Evidence Was Sufficient to Permit a Rational Trier of Fact to Find Mercedes Guilty

The evidence presented to the jury was overwhelming, and certainly far more than sufficient to sustain the jury's verdict. *Persico*, 645 F.3d at 104 ("The test for sufficiency is whether … a 'rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (quoting *Jackson*, 335 F.3d at 180)).

First, Lisa Henderson's testimony on its own—that Coleman was a heroin distributor and that Mercedes was one of his suppliers (Tr. 130–131, 169–177)—was sufficient to convict Mercedes. *See*, *e.g.*, *Truman*, 688 F.3d at 139 ("even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not 'incredible on its face,' … or does not 'def[y] physical realities.'" (quoting *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006)); *United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008))); *Florez*, 447 F.3d at 155 (same); *United States v. Anderson*, 747 F.3d 51, 60–61 (2d Cir. 2004) (same); *United States v. Danilovich*, 731 F. App'x

11

45, 49 (2d Cir. 2018) (same); *United States v. Reyes*, 384 F. App'x 37, 40 (2d Cir. 2010) (same); *United States v. Ramos*, 314 F. App'x 344, 346 (2d Cir. 2008) (same); *United States v. Gil*, 298 F. App'x 73, 74–75 (2d Cir. 2008) (same); *United States v. Coleman*, 215 F. App'x 28, 29 (2d Cir. 2007) (same); *United States v. Clark*, 319 F. App'x 46, 48 (2d Cir. 2009) (same). Indeed, Henderson's testimony not only established Mercedes's guilt of Count One, but even established his liability for the enhanced sentencing provisions of 21 U.S.C. § 841(b)(1)(B). Henderson explained that, three separate times, Coleman and Henderson drove to the Bronx to purchase $8,000 to $10,000 worth of heroin. (Tr. 173–74). That is, at $65 a gram (Tr. 51), Coleman had agreed to purchase *at least* between about 123 grams and 153 grams of heroin from Mercedes each time on three separate occasions.[13] Any one of those trips—evidence of an agreement to purchase heroin—established an agreement to possess with intent to distribute at least 100 grams of heroin.[14] *See*, *e.g.*, *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (explaining, in discussing a Section 846 conspiracy, that "[t]he essence of the crime of conspiracy, of course, 'is the *agreement*

---

[13] The jury heard evidence that Mercedes sometimes provided Coleman with heroin partially on consignment, as Coleman would sometimes still owe Mercedes a few thousand dollars after Mercedes supplied Coleman. Accordingly, it is possible that the $8,000 to $10,000 represented no more than a partial payment for heroin.

[14] Although not legally necessary, a jury could reasonably have inferred that those transactions were, in fact, consummated. Among other things: (1) the fact that Coleman kept returning to Mercedes implies that his relationship was successful; (2) Coleman complained to Henderson when he could not contact Mercedes to get heroin and when O supplied a bad batch of heroin, but never complained that Mercedes was not providing him with heroin on their trips to the Bronx; (3) when O provided Coleman with a bad batch of heroin, Coleman returned to Mercedes as his regular supplier, which implies that Mercedes had been regularly supplying Coleman; and (4) subsequent phone calls and text messages show that Coleman was not simply showing up randomly to get heroin from Mercedes, implying that he was not going to the Bronx with money if Mercedes did not have the heroin to provide to him.

… to commit one or more unlawful acts.'" (quoting *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006); *Braverman v. United States*, 317 U.S. 49, 53 (1942)) (emphasis in *Praddy*)); *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994) ("In drug conspiracies, the conspirators' agreement to produce narcotics, not the actual possession, sale or delivery of the drugs, is the essence of the crime." (citing *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990); *United States v. Tejada*, 956 F.2d 1256, 1264 (2d Cir. 1992); *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir. 1988))).

Second, the jury heard more than just Henderson's testimony. As described above, among other things, it heard and saw:

- Wiretap calls and text messages in which Coleman discussed how much money he owed Mercedes (GX 517, 520, 604), to whom Coleman referred as "that first dude that that that we was fucking with" (*i.e.*, his initial supplier) (GX 563), and his "plug" (*i.e.*, his drug supplier) (GX 525).

- Toll records and wiretap calls showing that Mercedes and Coleman were in frequent contact with one another (GX 430), and that Mercedes instructed his associates to trust Coleman, a heroin dealer (GX 517 (Celly Bro telling Coleman that Mercedes "told me you was a good nigga")).

- GPS and cell site data showing that meetings arranged by phone and text explicitly to exchange money or implicitly to exchange drugs in fact happened. (GX 430). Wiretap calls and text messages made clear what happened at these meetings; for example, an hour or so after the May 23, 2017, meeting, Coleman texted Mercedes to confirm that he was "safe," and Mercedes expressed relief,

13

saying "good." (GX 605). The jury could reasonably infer that Coleman had picked up heroin from Mercedes, and let him know he was "safe" after he got home unmolested, and that inference was cemented six days later, when Mercedes and Coleman texted clearly about heroin, with Mercedes asking Coleman if "it [is] working good" and Coleman responding that he "didn't crack it yet"—*i.e.*, he had not begun using the last supply of heroin Mercedes gave Coleman—because "[i]t's always like this [slow] at the end of the month," but offering Mercedes "a stack if u need it though." (GX 604). On July 3, 2017, after Mercedes texted: "You want me to go now" (GX 604), Coleman— apparently relieved—made sure that Acquino, his heroin distributor, knew that he was getting more heroin: "my man about to come see me." (GX 559).[15] And Coleman's man—Mercedes—did come to see Coleman. (GX 604, 430 at 15–16). About an hour later, Coleman again called Acquino, explaining: "My man just came to see me too. Just gave me 25 right now." (GX 562). Coleman was "relieved, that relieved a lot of stress." (GX 562). A jury could reasonably infer that Coleman's discussion with his heroin distributor about getting something from his "man"—to whom he had previously referred as his "plug" (GX 525)— meant that his "man"—Mercedes—was supplying him with heroin.

---

[15] Notably, in the past, when Coleman needed an additional $100 to pay Mercedes $2,000 for a pre-existing debt, he turned to his heroin distributor, Acquino, describing the situation in detail (GX 524). A jury could reasonably infer that Coleman was collecting money from his heroin distributor because his debt was related to heroin.

- The July 6, 2017, searches—less than three full days after Coleman and Mercedes met for Mercedes to supply Coleman with something—in which law enforcement found $13,520 worth of heroin, as well as narcotics paraphernalia, at Coleman's apartment and $13,530 of cash in Mercedes's jacket pocket. (Tr. 228–32, 261–71, 285–86; GX 10, 219, 706, 708–10, 713). A jury could reasonably infer that the cash and heroin confirmed that the July 3, 2017, transaction was, in fact, a heroin transaction in which Mercedes provided Coleman with approximately 208 grams of heroin, for which Coleman paid $13,530. This inference would be reinforced by the fact that Mercedes's apartment was fortified, with a large, opaque iron fence, security cameras, and two security doors, which extraordinary security would be logically consistent with a drug dealer protecting his stash. (Tr. 222–24; GX 35–43).

In short, the evidence of Mercedes's involvement in a conspiracy to distribute and possess with intent to distribute heroin—primarily by supplying Coleman with heroin—was not just sufficient to survive a Rule 29 motion, but was overwhelming, particularly in light of the well-known command that the evidence must be viewed "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Pierce*, 785 F.3d at 838 (internal quotation marks omitted).

### 2. Mercedes Does Not Overcome His Heavy Burden in Seeking to Overturn the Jury's Verdict

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *Kozeny*, 667 F.3d at 139. In the face of overwhelming evidence, Mercedes makes two arguments: (1) Henderson's testimony is insufficient to prove that Mercedes was a part of a conspiracy to

distribute heroin; and (2) the evidence did not prove that Mercedes, in fact, possessed the heroin

in Coleman's apartment at the time it was seized. Neither comes close to meeting his heavy burden.

First, Mercedes argues—eliminating references to legal principles offered without

analysis—that:

> The evidence described above does not sufficiently show the participation of defendant Mercedes in a conspiracy, with Coleman and Acquino,[16] to possess heroin and to possess heroin with intent to distribute. … The evidence adduced by the government did not show that Coleman purchased illegal drugs from Mercedes and was utterly insufficient to show that Mercedes joined in a conspiracy to distribute [h]eroin. … Simply put, the testimony of Lisa Henderson was insufficient to connect Leibys Mercedes to the Coleman/Acquino conspiracy to distribute [h]eroin.

(Br. 5–6). This vague argument appears to be that: (a) as a general matter, the evidence was

insufficient to permit a jury to convict Mercedes; and (b) as a particular matter, Henderson's

testimony was insufficient to permit a jury to convict Mercedes.

Each argument is meritless. As described in extensive detail above, there was

overwhelming evidence of Mercedes's guilt, whether from Henderson or elsewhere. And, even

without the additional evidence—of which there were volumes—Henderson's testimony that

Mercedes was "Christopher Coleman's plug … drug supplier [for] heroin" (Tr. 131), particularly

when paired with Henderson's testimony about driving to the Bronx with Coleman to buy over a

---

[16] Of course, "to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all their activities." (Tr. 436). *See*, *e.g.*, *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) ("Indeed, in order for a single conspiracy to be found, it is not necessary that the conspirators even know the identities of all the other conspirators." (citing *Blumenthal v. United States*, 332 U.S. 539, 447 (1947); *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006); *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979)).

hundred grams of heroin from Mercedes on three different occasions, Coleman's switch to O as his supplier, and switch back to Mercedes as a regular supplier (Tr. 173–77), was more than sufficient "to connect Leibys Mercedes to the Coleman/Acquino conspiracy to distribute [h]eroin." *See*, *e.g.*, *Truman*, 688 F.3d at 139 ("even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not 'incredible on its face,' … or does not 'def[y] physical realities.'" (quoting *Florez*, 447 F.3d at 155; *Coté*, 544 F.3d at 101)). Mercedes also implies—though he does not explicitly argue—that this Court should disregard Henderson because she testified pursuant to a cooperation agreement, did not see the actual meetings between Coleman and Mercedes, and only met Mercedes once. (Br. 4–5).[17] Even if Mercedes did actually raise these credibility arguments, they would have no legal merit on a Rule 29 motion. *See*, *e.g.*, *United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir. 1992) ("[T]he credibility of the witnesses … [is an issue] within the province of the jury, and we are not entitled to second-guess the jury's assessments."); *United States v. Minaya*, 544 F. App'x 12, 15 (2d Cir. 2013) ("although Taverez Guzman was testifying pursuant to a cooperation agreement in the hope of receiving a reduced sentence, the defense counsel thoroughly questioned the witness on this matter, and the jury had the opportunity to consider his credibility. … We find that the jury was entitled to credit [his] testimony.").

Second, Mercedes argues that "the government did not produce sufficient evidence at trial[] to attribute the [h]eroin found on Coleman[] to Mercedes," thereby undermining "[a]n essential element of this offense[:] possession with intent to distribute." (Br. 6). Mercedes's argument is

---

[17] At trial, Mercedes objected to Henderson's identification of Mercedes because "despite Ms. Henderson's testimony, I do not believe her …." (Tr. 171). The Court quickly and properly rejected this argument. (Tr. 171).

split:[18] first, he argues that "the jury found, based essentially on the testimony of Lisa Henderson, that Mercedes possessed with intent to distribute[] the [208] grams of [h]eroin that was found in Coleman's residence" (Br. 6); then he argues that the Government connected Mercedes to the heroin found at Coleman's apartment "rel[ying] on circumstantial evidence and the theory of constructive possession" (Br. 7). These arguments are odd. Henderson never testified about the heroin found at Coleman's apartment, and the Government did not argue otherwise. Nor did the Government ever argue that Mercedes constructively possessed the heroin found at Coleman's apartment. It did not have to do so. Possession is not, in fact, an element of a conspiracy drug conspiracy. *See*, *e.g.*, *Hendrickson*, 26 F.3d at 333 ("In drug conspiracies, the conspirators' agreement to produce narcotics, not the actual possession, sale or delivery of the drugs, is the essence of the crime." (citations omitted)). And the charged conspiracy began in January 2017; Mercedes did not have to be responsible for any particular drugs or transaction on the date of his arrest. However, as Mercedes appears to grudgingly admit, "circumstantial evidence" would allow a jury to find that Mercedes was responsible for the 208 grams of heroin found in Coleman's apartment. (Br. 7). And, of course, in considering a Rule 29 motion, the Court must "bear in mind

---

[18] Mercedes also states: "alternatively, the jury attributed to Mercedes, based on Henderson's testimony, the heroin equivalent of '$8,000 – $10,000" multiplied by three trips. The evidence is insufficient to sustain the conviction on this score." (Br. 7). Without discussion, it is hard to understand why Mercedes believes that the evidence was insufficient, but, in any case, as discussed above, not only was the evidence sufficient, but it proved that Mercedes and Coleman *agreed* to engage in a heroin transaction involving at least $8,000 to $10,000 worth of heroin on *at least* one of those occasions, and such agreement—not actual possession—is all that is necessary in a conspiracy case.

that the jury's verdict may rest entirely on circumstantial evidence." *Jackson*, 335 F.3d at 180

(citing *Martinez*, 54 F.3d at 1043).

In short, Mercedes's argument—which was already rejected by the jury—cuts against

virtually every standard for this Court's consideration of a sufficiency challenge, asking this Court

to disregard evidence, conclude that the testimony of a witness was not credible, consider each

piece of evidence in isolation rather than in context, and draw all inferences in favor of Mercedes

himself. When the evidence is properly considered, it amply supports the jury's verdict.

## IV.    Conclusion

For the foregoing reasons, the Court should deny Mercedes' motion for a judgment of

acquittal.

Dated: White Plains, New York
      January 7, 2019

<div style="margin-left:40%">

Respectfully submitted,
GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:   /s Samuel L. Raymond
      Samuel L. Raymond
      Daniel Loss
      Michael D. Maimin
      Assistant United States Attorneys
      (914) 993-1946 / 1924 / 1952

</div>